**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **NORTHWESTERN UNIVERSITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 C 599** |
| | ) | |
| **KUKA AG and REIS ROBOTICS USA INC.** | ) | |
| **d/b/a KUKA INDUSTRIES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Northwestern University has sued KUKA AG and Reis Robotics USA Inc. d/b/a KUKA Industries for patent infringement. Specifically, Northwestern alleges infringement of U.S. Patent Numbers 6,928,336, 6,907,317, and 7,120,508, which "claim groundbreaking intelligent assist systems in the field of collaborative robotics." First Am. Compl. ¶ 1. KUKA has moved to dismiss Northwestern's claim under Federal Rule of Civil Procedure 12(b)(6), arguing that the asserted patents are "directed to abstract ideas and lack inventive concepts sufficient to render them patent eligible under 35 U.S.C. § 101." Defs.' Opening Mem. at 1. The Court denies the motion to dismiss for the reasons stated below.

### Background

In industrial settings, human workers often need assistance to move heavy payloads. Assist devices generally come in one of two forms: (1) passive assist devices, like trolleys on unpowered overhead rail systems, and (2) industrial robots, like

powered overhead gantry cranes.  The former assist human operators by supporting the payload, reducing strain and minimizing the chance of injury, whereas the latter generate additional force to move heavy payloads without human interaction.  Both types of devices, however, are less than ideal.  Although passive assist devices relieve strain on human operators, controlling the movement of these heavy payloads requires side-to-side stabilization that can cause injury to the upper body and back.  Similarly, although industrial robots can move heavier payloads, they are dangerous and cannot operate with—or even in the vicinity of—humans.

Intelligent assist devices (IADs) purport to fix these problems.  IADs are "a class of computer-controlled machines that interact with a human operator to assist in moving a payload."  '336 Patent at 1:63–65.  IADs provide human operators with various kinds of assistance, e.g., supporting payload weight, overcoming friction, and guiding payload motion, and they are better able to communicate with human operators for increased safety and efficiency.  In this way, IADs "merge the best of passive and active devices," combining the "powered assistance" of industrial robots with the "greater dexterity and speed" of assist devices.  *Id.* at 2:42–44, 48.

The asserted patents in this case relate to "a modular architecture of components that can be programmed to create [IADs] from a number of components."  *Id.* at 2:63–66.  Essentially, the patents envision a new type of IAD, called an intelligent assist system, made up of a series of modules like trolleys, lifts, sensors, and hubs.  Some of these modules contain computational nodes, which connect to sensors and a plant network, distributing control throughout the system.  These nodes allow the modules to act both independently and in coordination, and they allow the system to centrally

2

process data via a computer controller.  The intelligent assist system is also more capable of working cooperatively with humans than prior IADs.  Through the inclusion of intent sensors, the intelligent assist system can respond to hands-on direction from human operators and make predictions about the operator's actions in real time—unlike the prior art devices.

The claims in the '336 patent recite the above-described intelligent assist system. For example, claim 1 of the '336 patent recites "[a]n intelligent assist system having a modular architecture," including "a motion module for supporting and moving a payload"; "a plurality of computational nodes"; and "a plurality of communication links." *Id.* at 19:31–41.  Likewise, claim 27 of the '336 patent recites "[a]n intelligent assist system" composed of "an overhead support"; "an intelligent assist module constructed and arranged to move a payload"; "a plurality of computational nodes"; and "a communication link that connects two of the plurality of computational nodes."  *Id.* at 20:39–50.

The '317 and '508 patents claim modules used in the intelligent assist system. For example, claim 1 of the '317 patent recites "[a] multi-function hub for use in an intelligent assist system," comprising "a physical interface configured and arranged to be a central interface point for an operator"; "a computational node disposed on the physical interface," and "an input/output . . . interface for interfacing with an information network and disposed on the physical interface."  '317 Patent at 19:28–48.  Similarly, claim 1 of the '508 patent recites "[a] configuration system for an intelligent assist system, the intelligent assist system comprising a module, and a computational node on the module."  '508 Patent at 19:30–34.  The computational system claimed in the '508

patent comprises "a host computer system capable of executing a stored program"; "a graphical user interface enabling a user to manipulate objects related to the module or the computational node"; and "a plurality of visual indicators corresponding to a status of the module, the computational node, or the communication link." *Id.* at 19:35–44.

On February 2, 2021, Northwestern sued KUKA for patent infringement. KUKA filed a motion to dismiss for failure to state a claim, arguing that the claims of the asserted patents are patent-ineligible under 35 U.S.C. § 101. On June 16, 2021, Northwestern filed an amended complaint. In it, Northwestern alleges that KUKA designed, developed, manufactured, marketed, and sold robots that "meet each and every element of one or more claims of" the '336, '317, and '508 patents. First Am. Compl. ¶¶ 54, 75, 96. Northwestern also alleges that KUKA engaged in this infringing activity "despite having knowledge of the Northwestern patents at issue." *Id.* at 11. Northwestern asks the Court to (1) enter judgment declaring that KUKA infringes each of the asserted patents; (2) award compensatory damages; (3) award treble damages for willful infringement; (4) "order an accounting to determine the damages to be awarded"; (5) "assess pre-judgment and post-judgment interest and costs against the KUKA Defendants, together with an award of such interest and costs"; (6) award costs, expenses, and reasonable attorney's fees; and (7) enter any other relief that the Court deems just or proper. *Id.* at 32.

Two weeks after Northwestern filed its first amended complaint, KUKA renewed its motion to dismiss. KUKA contends that "none of the amendments change that the Asserted Patents are drawn to patent-ineligible subject matter under 35 U.S.C. § 101." Defs.' Opening Mem. at 1. Specifically, it argues that the asserted patents are directed

4

to an abstract idea and the claims lack an inventive concept. *Id.* at 5, 9.

## Discussion

The question on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is whether the complaint states "a claim to relief that is plausible on its face." *See Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (citation omitted). In deciding the motion, the court must take "true all well-pleaded factual allegations and mak[e] all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011) (citation omitted). Still, the plaintiff must provide "some specific facts to support the legal claims asserted" and cannot rely on conclusory allegations to make his claim. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citation omitted).

Under the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent . . . ." 35 U.S.C. § 101. This provision is limited by the long-recognized exception that "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)).

In *Alice*, the Supreme Court outlined a two-step analysis to determine whether a claim is patent eligible. First, the court "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* at 217. If not, the claim is patent eligible, and the inquiry ends. In contrast, if the claim is directed at a patent-ineligible concept, the court moves on to step two, which asks if there is an "inventive

concept . . . sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* at 217–18 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72–73 (2012)).

## A.  *Alice* step one

Under the first step of the *Alice* inquiry, a court must determine whether the claims at issue are directed to a patent-ineligible concept.  *Id.* at 217.  A court must "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful."  *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017).  Because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Mayo*, 566 U.S. at 71; *Alice*, 573 U.S. at 217.

The Supreme Court "has not established a definitive rule to determine what constitutes an 'abstract idea.'"  *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).  Nevertheless, courts have "found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."  *Id.*  Accordingly, an examination of Federal Circuit precedent sheds helpful light on the *Alice* step one analysis.

In *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 770 (Fed. Cir. 2019), the Federal Circuit held that a claim related to networked charging stations for electric vehicles was not patent eligible because "the focus of the claim [was] on the abstract idea of network communication for device interaction."  The court noted that "the specification never suggests that the charging station itself is improved from a technical

6

perspective, or that it would operate differently than it otherwise could." *Id.* at 768. It also noted that the invention did not claim to "overcom[e] some sort of technical difficulty in adding networking capability to the charging stations." *Id.* Thus the court concluded that "the invention of the patent [was] nothing more than the abstract idea of communication over a network for interacting with a device, applied to the context of the electric vehicle charging stations." *Id.*

In contrast, the Federal Circuit held in *Thales* that claims reciting a system for tracking an object's motion relative to a moving reference frame were not directed to patent-ineligible subject matter. The court found that "the claims [were instead] directed to systems and methods that use inertial sensors in a non-conventional manner" and that these improvements minimized the accuracy problems associated with the prior art. *Thales*, 850 F.3d at 1348–49. Although the disclosed system comprised all known components, "[t]he claims specif[ied] a particular configuration of inertial sensors and a particular method of using the raw data from the sensors . . . ." *Id.* at 1349. As a result, the court held that the claims were not directed to an abstract idea.

Similarly, in *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), the Federal Circuit held that a patent claiming a process to automatically synchronize lip and facial expressions of animated characters was directed at patent-eligible subject matter. The defendants contended that the claims were directed to patent-ineligible content because they amounted to the use of general-purpose computers to automate a task previously done by humans. The court disagreed, emphasizing that the claimed process was not the same as the prior one used by human animators. Thus, although the process was carried out by general-

purpose computers, the claims were still patentable because they "use[d] the limited rules in a process specifically designed to achieve an improved technological result in conventional industry practice." *Id.* at 1316.

In this case, KUKA contends that the claims of the asserted patents are directed to the same abstract idea that invalidated the patents in *ChargePoint*: network communication for device interaction. KUKA argues that the asserted patents "use conventional technology to network together standard factory equipment, such as trolleys and lifts, to move a payload." Defs.' Opening Mem. at 5. KUKA also argues that the claims are directed to an abstract idea because they simply replace the work otherwise performed through human labor with "known computer techniques for automation of known processes." *Id.* at 6 (quoting *Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021)).

Northwestern disagrees. It argues that *Thales* is controlling and that the asserted patents' claims are directed to a patent-eligible concept involving an improvement of existing technology. Specifically, Northwestern contends that the claims of the asserted patents are directed to "a modular architecture that specifies an arrangement of components that distributes control and gives rise to a new type of robot that can operate closer to humans, with greater autonomy and more intelligence of its surroundings." Pl.'s Resp. Mem. at 5. Northwestern also disputes KUKA's characterization of the invention as merely replacing people communicating in a factory with communication links. According to Northwestern, the intelligent assist system communicates with human operators in ways that are different from how humans communicate with other humans, namely through novel intent sensors. Because of the

distinct process by which the intelligent assist system collaborates with humans, Northwestern contends that this case is like *McRO*, where the automated solution claimed in the patent was different from the human method previously used.

To determine what claims are "directed to," courts often look to the patent's specification "to understand 'the problem facing the inventor' and, ultimately, what the patent describes as the invention." *ChargePoint*, 920 F.3d at 767 (quoting *In re TLI Commc'ns*, 823 F.3d 607, 612 (Fed. Cir. 2016)). In this case, the shared specification states—in the summary of the invention—that "disclosed is a *modular architecture of components* that can be programmed to create [IADs] from a number of components." '336 Patent at 2:63–66 (emphasis added). It also states: "Disclosed is a *modular system architecture* coordinated by serial digital communication, to allow ease of configuration to a variety of applications." *Id.* at 2:66–3:1 (emphasis added). These provisions suggest that what the claims are directed to is the intelligent assist system's modular architecture.

The language of the patent claims further supports this conclusion. All the claims in the asserted patents recite, relate to, or rely upon the modular architecture of the intelligent assist system. For example, claim 1 of the '336 patent recites "[a]n intelligent assist system having a modular architecture." *Id.* at 19:31–32. Similarly, the claims in the '317 and '508 patents relate to specific components within the modular intelligent assist system. Claim 1 of the '317 patent recites "[a] multi-function hub for use in an intelligent assist system," and claim 1 of the '508 patent recites "[a] configuration system for an intelligent assist system." '317 Patent at 19:28–29; '508 Patent at 19:31.

Northwestern plausibly alleges that this modular architecture was an

improvement to the prior art. Unlike previous IADs that were "limited in their application," Northwestern alleges, the intelligent assist system claimed in the patents features distributed control that "minimiz[es] the need for central control of every joint and moving piece while still having a system in communication to globally handle the overall task assigned to the system." First Am. Compl. ¶¶ 39–40. Additionally, the intelligent assist system contemplates the inclusion of intent sensors as modules, allowing the invention to intelligently predict and respond to human operators' actions. Whereas prior IADs "were limited to the user affirmatively inputting data about their intentions . . . or to detecting the forces that the operator was supplying," Northwestern says, "the inventions of the asserted patents use readings from sensors . . . to make predictions about the operator's actions in real time . . . and adjust the system's movements accordingly." *Id.* ¶ 41. In this way, the claims of the asserted patents are similar to those in *Thales*, where the invention "provide[d] a method that eliminate[d] many 'complications' inherent in previous solutions." *Thales*, 850 F.3d at 1348.

Additionally, the intelligent assist system in this case and the inertial tracking system in *Thales* improved upon the prior art in similar ways. Both inventions utilize generic components but organize them in a non-conventional way. In *Thales*, "[t]he claims specif[ied] a particular configuration of inertial sensors and a particular method of using the raw data from the sensors . . . ." *Id.* at 1349. Similarly, the claims in the asserted patents specify a particular configuration of modules, computational nodes, and communication links, creating an improved device with enhanced safety, efficiency,

and control.[1]

KUKA contends that *Thales* is inapposite because Northwestern does not specifically explain "(1) how the modular architecture is configured; (2) what programming is needed for the modules and sensors; and (3) what 'sophisticated componentry' is needed beyond the standard, off-the-shelf components found in the specification." Defs.' Reply Mem. at 6. But Northwestern is not required to explain the invention at such a high level of specificity in its complaint. It is enough for Northwestern to allege plausibly, as it has, that the claims improve upon prior technology by implementing a novel modular architecture, incorporating computational nodes, communication links, and modules like trolleys and sensors. Because the benefit of the invention is its modularity, versatility, and adaptability, requiring Northwestern to allege the invention's configuration, programming, and componentry at such a high level of specificity would be difficult—if not impossible. *See* '336 Patent at 7:14–17 ("[I]t would be appreciated by one skilled in the art that the versatility of the modular architecture disclosed herein is intended to facilitate use in these and other types of configurations.").

In addition, Northwestern does not simply state that the asserted patents improved upon prior technology without explaining how it does so. Rather, it explains the improvement that the intelligent assist system adds to prior art IADs, namely the novel modular architecture described above. *See Enfish*, 822 F.3d at 1336 (holding that

---

[1] For this reason, KUKA's contention that "the computer techniques recited in the claims were known, standard techniques, and that these techniques were implemented with standard, off-the-shelf components" falls short. Defs.' Opening Mem. at 6. Claims involving generic components can still be patent-eligible if they used those components in non-conventional ways. *See Thales*, 850 F.3d at 1348–49.

a patent was not directed to patent-ineligible subject matter because the claims were "directed to a specific improvement to the way computers operate").  As such, this case is unlike *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018), where the claims "failed to recite a practical way of applying an underlying idea."  Nor is it like *American Axle & Manufacturing, Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1295 (Fed. Cir. 2020), where "[w]hat [was] missing [was] any physical structure or steps for achieving the claimed result."

KUKA's comparison to *ChargePoint* also fails.  KUKA argues that the claims in the asserted patents are directed to the same "abstract idea of network communication for device interaction" as in *ChargePoint* because the asserted patents "simply add networking capabilities to existing modules."  Defs.' Opening Mem. at 6 (quoting *ChargePoint*, 920 F.3d at 770) (internal quotation marks omitted).  But other than the inventions' shared networking capabilities, these cases share few similarities.  In *ChargePoint*, the sole problem identified in the specification "was the lack of a communication network that would allow drivers, businesses, and utility companies to interact efficiently with the charging stations."  *ChargePoint*, 920 F.3d at 767.  It was this lack of connectivity that the charging stations sought to address.  In this case, however, the stated purpose of the invention is much broader:  "the need for natural and intuitive control of the motion of a payload by a human operator for ease of use and safety."  '336 Patent at 2:60–63.  To achieve this end, the patents claim specific and concrete improvements to prior IADs to increase the efficiency, safety, and responsiveness of the devices.  The specification cites the need for IADs to communicate unambiguously with humans, help humans move larger payloads, and have greater dexterity and speed—in

12

*addition to* the need for IADs to be connected and integrated to work together.  Though the patents in *ChargePoint* were solely focused on adding networking components to charging stations, the asserted patents here use networking as a means to their actual aim:  a modular architecture with distributed control and increased capacity to cooperate with humans.

To be sure, networking capabilities are a crucial benefit of the claimed invention. *See* '336 Patent at 2:66–31 ("Disclosed is a modular system architecture *coordinated by serial digital communication*, to allow ease of configuration to a variety of applications.") (emphasis added); *id.* at 2:52–53 (identifying one of the problems of the prior art as the need for "the ability to connect and integrate a number of IAD components to work together").  But there is much more to the intelligent assist system described in the patents than its networking capabilities.  As Northwestern states, "implementing a modular architecture with certain novel modules and sensors advances the prior art and enables particular functions—far more than merely adding individual components into a network." Pl.'s Resp. Mem. at 9.  This was not the case in *ChargePoint*, where the specifications "never suggest[ed] that the charging station itself [was] improved from a technical perspective." *Id.* at 768.  Comparing this case to *ChargePoint* would require the Court to vastly oversimplify the claims in the asserted patents.  The Federal Circuit has repeatedly cautioned courts against such oversimplification. *See, e.g., McRO*, 837 F.3d at 1313.

Similarly, KUKA's argument that "[t]he claims, at most, simply replace people with generic computer components" oversimplifies the claims in the asserted patents, at least so far as the Court can tell on a motion to dismiss for failure to state a claim.

Defs.' Opening Mem. at 5.  Instead of simply taking human tasks and doing it on a computer, the intelligent assist system changes the process altogether.  Unlike industrial robots that could not operate around humans, the intelligent assist system claimed in the patents is designed to collaborate with them.  Additionally, the way the intelligent assist system communicates is not simply the automated version of "two workers speaking as they move equipment around the factory."  *Id.*  The claimed invention uses novel intent sensors not only to *react* to directions from a human operator but also to *predict* the actions of the human.  This method of communication is entirely different from the verbal communications of human workers.  As a result, this case is like *McRO*, where the court found that the patents were valid because the invention completed a task previously performed by humans using a "distinct process." *McRO*, 837 F.3d at 1314.

In sum, the Court overrules KUKA's contention that Northwestern's claims are directed to patent-ineligible subject matter.  For this reason, the Court need not move on to *Alice* step two, the search for an inventive concept.  Even if that were not the case, dismissal at this stage would be improper given that there are factual disputes regarding whether the patents provide an inventive concept.  The parties dispute whether the modular architecture of the intelligent assist system, the '317 patent's multi-functional hub, and the '508 patent's configuration system are novel enough to provide an inventive concept.  Similarly, the parties dispute whether the intent sensors provide an inventive concept.  The Court cannot resolve these disputes in KUKA's favor in adjudicating a motion to dismiss under Rule 12(b)(6).

KUKA argues that there are no factual disputes because Northwestern "fail[s] to

14

actually show that the modules—all of which were known in the art—are configured in a novel or unconventional way." Defs.' Reply Mem. at 11. But this contention ignores Northwestern's allegations, which, if accepted as true, show that the claimed inventions differ in significant ways from the prior art. With respect to the '336 patent, Northwestern alleges that the intelligent assist system central to each claim incorporates a novel modular architecture. It states in particular that "[a]t the time of the invention, such distributed control was unknown for [IADs]." First Am. Compl. ¶ 40. With respect to the '317 and '508 patents, Northwestern alleges that the multi-function hub and configuration systems are novel, as they are specifically designed to work with the inventive intelligent assist system. Additionally, Northwestern alleges that the incorporation of intent sensors to make predictions about and respond to human operators' actions in real time is also novel, contributing to an inventive concept in several claims. *See* '336 Patent, claim 25; '317 Patent, claims 5, 21–31. None of these allegations are inconsistent with the claims or specifications in the patents, as KUKA contends. Thus, "taking true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor," the Court concludes that the complaint plausibly states a claim for relief. *AnchorBank*, 649 F.3d at 614.

### Conclusion

For the foregoing reasons, the Court denies KUKA's motion to dismiss [dkt. no. 36] and directs KUKA to answer the amended complaint within twenty-one days of this order.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 8, 2021

15